QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
  David W. Quinto (Bar No. 106232)
   davidquinto@quinnemanuel.com
  Diane M. Doolittle (Bar No. 142046)
   dianedoolittle@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
Telephone:   (213) 443-3000
Facsimile:    (213) 443-3100       NOTE: CHANGES MADE BY THE COURT

BAKER MARQUART CRONE & HAWXHURST LLP
  Daryl M. Crone (Bar No. 209610)
   dcrone@bmchlaw.com
10990 Wilshire Boulevard, Fourth Floor
Los Angeles, California 90024
Telephone:  (424) 652-7800
Facsimile:   (424) 652-7850

Attorneys for Defendant
Home Depot U.S.A., Inc.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| RENT INFORMATION TECHNOLOGY, INC.,<br><br>        Plaintiff,<br><br>     vs.<br><br>THE HOME DEPOT U.S.A., a Georgia corporation, and DOES 1 to 100 inclusive,<br><br>        Defendants. | CASE NO. CV05-7198 R (JWJx)<br><br>**[~~PROPOSED~~] FINDINGS OF FACT AND CONCLUSIONS OF LAW SUBMITTED BY DEFENDANT HOME DEPOT U.S.A., INC.**<br><br>Crtrm.:     8<br><br>Date Filed:  September 8, 2005<br>Trial Date:  September 23, 2008 |

## **FINDINGS OF FACT**

### Trial Proceedings

1.      This Court presided over a trial from September 23 through September 26, 2008 in the above-referenced matter on plaintiff Rent Information Technology, Inc.'s ("Rent IT") claim that defendant The Home Depot U.S.A., Inc. ("Home Depot") breached the Mutual Non Disclosure Agreement ("NDA") between the parties dated March 2, 2004.  Rent IT presented live testimony from two witnesses: Craig Haddox, a former Home Depot employee, and Marlene Moncure, principal and co-founder of Rent IT.  Home Depot presented live testimony from two witnesses, Michael Goodell, Vice President of Information Technology at Home Depot, and Daniel MacAreavy, Vice President of Contract Services at Home Depot.  Both parties also submitted deposition testimony from other witnesses.

2.      The Court finds that Messrs. Goodell and MacAreavy were credible witnesses in all aspects of their testimony after considering each witness' memory, each witness' demeanor while testifying, each witness' bias, whether there were contradictions between the witness' testimony and their own statements relative to this case, and the reasonableness of each witness' testimony in light of all the evidence.

3.      To the extent Rent IT's Ms. Moncure and Home Depot's former employee, Mr. Haddox, testified to facts supporting Rent IT's allegations in this case, the Court finds that their testimony is not credible after considering each witness' memory, each witness' demeanor while testifying, each witness' bias, whether there were contradictions between each witness' testimony and their own statements relative to this case, and the reasonableness of each witness' testimony in light of all the evidence.

4.      In particular, Mr. Haddox's testimony in favor of Rent IT lacked credibility.  Mr. Haddox has been a good friend of Ms. Moncure since before Home Depot initiated its tool rental software replacement project in the fall of 2003.  His

-1-

1  conflict of interest was evidenced by having forwarded multiple confidential internal

2  communications from high-level Home Depot executives to Ms. Moncure during

3  the term of his employment.  In addition, Mr. Haddox's vague testimony that Home

4  Depot's attorneys somehow acted improperly when they filed a declaration in

5  support of Home Depot's motion for summary judgment two years ago lacked any

6  substantiation, and only further undermined the credibility of his testimony in favor

7  of Rent IT.

8                    The Software Procurement Process

9          5.     In the fall of 2003, the Tool Rental Division of Home Depot

10  began to explore the purchase of a replacement tool rental software system.

11          6.     Thereafter, Home Depot's Tool Rental operations manager for

12  the software replacement project, Craig Haddox, contacted his friends Marlene

13  Moncure and Terrence Wynne to discuss the possibility of having them create a

14  program based on the SAP software platform that would include the functionality

15  needed by the Tool Rental Division.  Ms. Moncure and Mr. Wynne were interested

16  in pursuing the concept, and founded Rent IT to develop SAP-based tool rental

17  software to be marketed to Home Depot and other companies throughout the world.

18          7.     In early 2004, pursuant to Home Depot's standard information

19  technology evaluation and contracting process, the Home Depot Information

20  Technology Department ("IT Department") for the tool rental software replacement

21  project began to assemble a Request for Information ("RFI") to give to vendors

22  potentially interested in selling a software solution to Home Depot.  Mr. Haddox

23  was advised by the IT Department that he needed to provide a high-level list of

24  Home Depot's business requirements setting forth the software functionality

25  requested by Home Depot's tool rental business in order to incorporate it into the

26  RFI to distribute to various software vendors.

27

28

DEFENDANT'S [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW

The Business Requirements

8.   Home Depot thereafter hired Rent IT for the purpose of helping Home Depot create the business requirements and other software evaluation documents known as "process flows" and "use cases" because Mr. Haddox, who could have documented the Tool Rental Division's business requirements, was too busy to do so.  Mr. Haddox and Ms. Moncure agreed that Rent IT would help the Tool Rental Division prepare those materials in consideration for the payment of $60,000.

9.   Rent IT worked with Home Depot personnel to prepare the business requirements, process flows and use cases.  It provided those materials to Home Depot for use in the RFI process whereby Home Depot solicited information from various software vendors about the functionality of their software and whether such software could meet the needs of Home Depot's tool rental business.

10.   In April 2004, Home Depot circulated its RFI to vendors potentially interested in bidding on the tool rental software replacement project.  Those vendors included SAP, Rent IT's new business partner.  The RFI contained a modified version of the business requirements that had been recorded with Rent IT's assistance.

11.   Rent IT presented three separate invoices totaling $60,000 seeking payment for its preparation of  the business requirements, use cases and process flows.  The invoices were dated February 9, May 10 and May 28, 2004.  Home Depot subsequently paid the invoices in full.

12.   Rent IT accepted payment for its work on the business requirements, use cases and process flows without any reservation of rights or suggestion that the materials were "Confidential Information" under the NDA between the parties or that Home Depot had breached the NDA by using the business requirements in the earlier RFI process.

DEFENDANT'S [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW

13.     The parties understood and agreed that the business requirements, use cases and process flows would be the property of Home Depot, and would not be subject to any limitation on their use by Home Depot.  To the extent Ms. Moncure or Mr. Haddox suggested otherwise, this Court finds that their testimony was not credible.

14.     Rent IT failed to prove that the business requirements, use cases or process flows are Rent IT's "Confidential Information" under the parties' NDA and that Home Depot was prevented from using the materials.  As provided under Section 8 of the NDA, Home Depot could use any information (a) known to Home Depot "prior to disclosure by" Rent IT; (b) that was "independently developed" by Home Depot; or (c) "that is or becomes publicly available through no breach of" the NDA by Home Depot.

15.     As it relates to the business requirements, process flows and use cases, Ms. Moncure prepared those materials based upon conversations with Home Depot tool rental personnel, materials she located on the Internet, and by studying other tool rental businesses.  When she presented the materials to Home Depot, she did not advise it that she considered the materials to be Rent IT's Confidential Information.  At trial, she failed to identify any of the materials that were created by her that were confidential in any respect.  Instead, she was a scrivener of the business requirements as opposed to the originator of them in a confidential sense.

16.     Exhibit C to the NDA does not provide that the business requirements, use cases and process flows were "Confidential Information" under the NDA.  Rather, Home Depot paid for the materials, and there was no limitation on its right to use them.

17.     In addition, at the time it provided the business requirements, process flows and use cases, Rent IT was aware that they would be used in a competitive bidding process including an RFI and Request for Proposal ("RFP").

1 Ms. Moncure did not object to the use of or disclosure of the business requirements

2 or other materials in that process.

3        18.    Rather than objecting, Ms. Moncure participated in the

4 competitive bidding process by working with SAP, Rent IT's business partner at the

5 time, to respond to the RFI and RFP.  Ms. Moncure's testimony that she was

6 "shocked" that the business requirements were used in the RFI was not credible.

7 Among other things, Ms. Moncure admitted that she was aware that Home Depot

8 planned to conduct competitive bidding, and it is common sense that Home Depot

9 would have had to provide the business requirements to prospective vendors in

10 connection with the bidding process so that the vendors would know the terms and

11 scope of the project they were bidding on and respond accordingly.

12 <u>Rent IT's Rental Rate Advice</u>

13        19.    In late 2004, Mr. Wynne advised Mr. Haddox that Home Depot

14 should increase its customary prorated extra-hour rental rates by 150% -- from 10%

15 of the "four-hour" rate (also known as the half-day rate) to something between 18%

16 and 33% of the four-hour rate.  Mr. Wynne did not provide any documents, data or

17 code to implement his advice that Home Depot should increase its hourly rental

18 rates.

19        20.    Rent IT's advice to Home Depot to raise its prices is not

20 "Confidential Information" under the NDA.  Mr. Wynne did not indicate that he was

21 giving the advice in confidence or pursuant to the NDA.  Moreover, a person's

22 suggestion that a company can earn more money by raising its prices is not

23 confidential information that can be protected from "disclosure" pursuant to a

24 nondisclosure agreement.  Wynne's advice was simply a matter of common sense

25 that Home Depot should have been making more money, and was not confidential

26 information that Home Depot somehow misused.

27        21.    In addition, for several years preceding 2004, Home Depot

28 charged 25% or more of the four-hour rate for certain tools, and thus was already

1  knowledgeable about the pricing information provided to Mr. Haddox by Mr.

2  Wynne. Mr. Wynne's information was simply a method to raise prices for more

3  income.

4  <u>The Parties Never Agreed on a Software Development Contract</u>

5         22.    After considering all the responses to the RFI and RFP, Home

6  Depot decided to focus on the proposal made by Rent IT and SAP, and abandoned

7  any further exploration of competing proposals.

8         23.    Home Depot then proceeded to evaluate whether the Rent

9  IT/SAP proposal would work and whether it could be implemented within Home

10  Depot's budget.

11         24.    During this evaluation period in the fall of 2003, SAP withdrew

12  as Rent IT's partner and communicated in writing to Home Depot that the proposed

13  solution would not work.  SAP later advised Home Depot that Rent IT's proposed

14  solution was "doomed to failure."

15         25.    Although Rent IT provided a draft contract to Home Depot in

16  October of 2004 which set forth proposed business terms for a software

17  development contract, Home Depot rejected those terms. The parties thereafter

18  discussed numerous proposals intended to reduce Home Depot's risk and the cost to

19  procure and implement the software, but never reached any agreement on any of the

20  business terms for the development of tool rental software, including pricing.  By

21  February 4, 2005, after the date it had previously represented it could deliver the

22  needed software, Rent IT conceded that it had no product and was offering only to

23  develop a scaled-down "Conference Room Pilot" version of its proposed software

24  system to prove that the software eventually produced would function.

25         26.    At no point in time did any Home Depot employee promise to

26  contract with Rent IT.  Home Depot's Craig Haddox did not do so, and would not

27  have had the authority to do so.  Home Depot's Senior Vice President Joe DeAngelo

28  did not do so, and would not have had the authority to do so.  The evidence shows

DEFENDANT'S [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW

1  that Craig Haddox desired Rent IT be a sole source.  Home Depot never agreed to

2  proceed as a sole source at the expense of Home Depot.

3          27.    On March 17, 2005, Rent IT presented its proposed solution to

4  Home Depot at a type of Architecture Review Board meeting called a "Solution

5  Design Review."  Rent IT's proposal failed to gain approval at that Review Board.

6          28.    Rent IT claims that it was "promised a contract" if it could pass

7  Home Depot's separate, <u>Conceptual</u> Architecture Review Board.  Home Depot's

8  Conceptual Architecture Review Board does not, however, evaluate vendor-specific

9  proposals.  Instead, it determines whether a particular *approach* merits further

10 exploration.  Thus, at the March 29, 2005 Conceptual Architecture Review Board

11 meeting, the *concept* of a Conference Room Pilot version of SAP-based tool rental

12 software was approved.  However, that approval of the approach did not signify

13 approval of the specific Rent IT proposal, which had already been rejected on

14 March 17.

15         29.    In April 2005, for budgetary reasons and technical concerns, and

16 because the process was taking far longer than expected, Home Depot's Tool Rental

17 Division cancelled the software replacement project.  Home Depot immediately

18 advised Rent IT of its decision.

19         30.    At no time did Home Depot finalize or execute a contract with

20 Rent IT for new software for its tool rental business.  Under the NDA, Home Depot

21 had no obligation to contract with Rent IT for the tool rental replacement software,

22 and specifically noted that, by entering into the NDA, Home Depot was making "No

23 Commitment" to enter into such a contract.

24         31.    Rent IT never developed or delivered tool rental software that

25 ran on SAP.  By the time Home Depot cancelled the project and elected not to

26 contract with Rent IT in April 2005, substantial additional work remained to

27 develop, code and complete a workable SAP-based tool rental software.

28

32.     Shortly after deciding not to proceed with the software replacement project, Home Depot destroyed or sequestered all materials submitted by Rent IT in connection with its proposed SAP-based solution, including the technical documents submitted by Rent IT in advance of Home Depot's March 2005 "Solution Design Review."

<u>Home Depot's Legacy Software Enhancements</u>

33.     Because the software replacement project was taking longer than expected and because Home Depot frequently upgrades and modifies its software to meet changing business needs, Home Depot decided in late 2004 to enhance its existing tool rental software system.  In modifying its software, the Tool Rental Division implemented the following software modifications in early 2005:  (1) the ability to automatically store and produce safety sheet and "tool tip" printouts with each customer agreement; and (2) the ability to charge customers for fuel and equipment hour usage (*i.e.*, tool "usage and metering" charges).

34.     The concepts of "usage metering" and safety sheet printouts are generally known in the tool and equipment rental industry.  Specifically, the industry-leading software, "Rentalman," developed many years earlier by Moncure and Wynne, had those features.  In addition, Home Depot knew about and had planned to improve its legacy software system to include these very features of "usage metering" and safety sheet printing (and/or Home Depot intended to purchase replacement tool rental software having those features) even before Rent IT was formed in the fall of 2003.

35.     Home Depot's Information Technology Department personnel who performed the tool rental software enhancements did not use any Rent IT work product or concepts in their work on the enhancements, including but not limited to the business requirements, use cases and process flows.

<u>Other Factual Findings</u>

36.   Rent IT introduced no evidence that any materials or information it provided to Home Depot qualify as "Confidential" under the NDA.  Rent IT also failed to demonstrate that any information or material was provided to Home Depot in confidence.

37.   Rent IT introduced no evidence that Home Depot used or disclosed any of Rent IT's alleged Confidential information, and, therefore, Home Depot did not breach the NDA.

<u>Damages</u>

38.   <u>Lost Profits:</u>  Rent IT failed to demonstrate that the lost profits it claims that it expected to realize on a software development agreement can be traced solely to breach of the NDA.  Home Depot did not refuse to contract because it had breached the NDA and used Rent IT's confidential information.  Rather, it elected not to contract with Rent IT because Rent IT could not prove its solution would work, and the project was delayed and more expensive than originally thought.  Accordingly, Rent IT's claim for lost profits under a possible software development agreement fails.

39.   In addition, the parties had not reached agreement, or even an agreement in principle, on the terms of the proposed software development agreement.  They had not agreed on the scope of the project.  They had not agreed on the price.  Instead, the parties were continuing to negotiate the terms of a possible agreement until Home Depot cancelled its tool rental software replacement project in April 2005.

40.   Rent IT failed to come forward with evidence demonstrating, with reasonable certainty, the profits that Rent IT expected to earn on its proposed software development agreement.  Indeed, Rent IT failed to prove it would have made any profit at all.  Even assuming that the parties had reached agreement on the latest proposal for Rent IT to provide a Conference Room Pilot for approximately

-9-

$1,000,000, Rent IT admits that it would have earned no profit on such a contract. Moreover, as a start up business, Rent IT had no track record by which it would measure or estimate the profits it could expect on its proposed software development agreement.

41.   <u>Out of Pocket/Development Expenses:</u>  Rent IT was compensated for the business requirements, process flows and use cases by the $60,000 that it was paid by Home Depot.

42.   Rent IT acknowledged that it incurred little or no cost to develop the business requirements, thereby admitting that its development expenses for the materials it claims were confidential and misused by Home Depot were *de minimis.*

43.   Rent IT failed to present any credible evidence that it incurred its software development expenses, which Rent IT claims include the expense of running its entire business until April 2005, as part of its compliance with the NDA.

44.   Rent IT failed to prove that the software development expenses that it incurred were within the parties' contemplation as the probable and natural result of any breach of the NDA, particularly in light of Section 17 of the NDA, entitled "No Commitment," which provided that, irrespective of any disclosure of "Confidential Information," Home Depot was not "obligated to take, continue or forego any action with respect to the proposed business arrangement."  In that Rent IT acknowledged in writing that Home Depot had no obligation to proceed, the parties plainly intended that Rent IT would have no right to recover its software development expenses absent execution of additional, software development contracts.

45.   Rent IT never paid to its principals the "value" of their time spent trying to develop SAP-based tool rental software or preparing Rent IT's claimed "Confidential Information."

DEFENDANT'S [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW

46.     Rent IT failed to provide evidence of any harm or damage it suffered on account of Home Depot's disclosure of the business requirements (or of other materials) to third-parties in the software bidding process.

47.      Rent IT as Ms. Moncure testified had hopes of a world market for the software it was developing with SAP.

## CONCLUSIONS OF LAW

1.     This Court possesses jurisdiction of this action under 28 U.S.C. § 1332 and venue lies within this district.

2.     Plaintiff's only remaining claim, for breach of the NDA, is governed by Georgia law.

### Breach of Contract

3.     The Court finds that it was the parties' intent and agreement that Home Depot would own the business requirements, process flows and use cases prepared with Rent IT's assistance and not be limited in their use of the materials. The materials were designed primarily to memorialize Home Depot's business requirements for its tool rental business which, at the time, was earning between $400 to $500 million in annual revenue.  They were also commissioned with the intention to use them in a competitive bidding process whereby they would be disclosed to various tool rental software vendors who would be competing against Rent IT to try to contract with Home Depot for tool rental replacement software.  In addition, Mr. Haddox asked and Ms. Moncure agreed to prepare those materials in consideration for payment of $60,000.  There is no evidence that the parties placed any restriction on Home Depot's use of the materials.  Home Depot paid in full the $60,000 in invoices that Rent IT submitted for the materials.

4.     The intention and agreement of the parties is further confirmed by their conduct after signing the NDA.  Rent IT did not advise Home Depot it was

-11-

providing these materials as Confidential Information under the NDA.  Although it was aware of Home Depot's use of the business requirements in the RFI process, Rent IT never complained or objected to their use.  Even after Rent IT was aware that Home Depot used the business requirements in the RFI process, Rent IT continued to provide Home Depot with other materials, including software development materials, that it claims were its Confidential Information.

5.     As a separate and independent basis for entry of judgment in Home Depot's favor, plaintiff has made no showing that it disclosed anything confidential to Home Depot.

6.     Under Georgia law, a party may enforce an NDA only to protect information that is actually confidential.  See Tom James of Atlanta, Inc. v. McClure, 2002 WL 31749558, at *3 (N.D. Ga. Jan. 16, 2002) (a nondisclosure agreement is enforced only where, among other things, the plaintiff "is attempting to protect confidential information relating to the business"); Stahl Headers, Inc. v. MacDonald, 447 S.E.2d 320, 322 (Ga. Ct. App. 1994) ("to be valid, a non-disclosure agreement must satisfy the requirements of reasonableness under Georgia law" such as "whether the [plaintiff] is attempting to protect confidential information"); see also Sarkes Tarzian, Inc. v. Audio Devices, Inc., 166 F. Supp. 250, 265 (S.D. Cal. 1958), aff'd 283 F.2d 695 (9th Cir. 1960) ("matters which are generally known in the trade or readily discernible by those in the trade cannot be made secret by being so labelled in an agreement"); Cambridge Filter Corp. v. International Filter Co., 548 F. Supp. 1301, 1306 (D. Nev. 1982) ("An agreement between the employer and the employee that something is a trade secret or confidential is not controlling if in fact it is not.").

7.     Under Section 8 of the NDA, Home Depot could use any information (a) known to Home Depot "prior to disclosure by" Rent IT; (b) that was "independently developed" by Home Depot; or (c) "that is or becomes publicly available through no breach of" the NDA by Home Depot.  Accordingly, any

1  information that fell within Section 8 was not protected as "Confidential
2  Information" under the NDA.

3          8.      Rent IT failed to identify any information in the business
4  requirements, process flows and use cases that were confidential in any respect.
5  Rent IT also failed to identify any information in the RFI or RFP that was Rent IT's
6  confidential information.

7          9.      Home Depot's enhancements to its legacy tool rental software
8  system in late 2004 and early 2005 were based on features it knew about and
9  intended to implement before Rent IT disclosed any information to Home Depot,
10  and are features commonly known throughout the tool rental industry.

11          10.     In its remand order, the Ninth Circuit affirmed that "Rent IT's
12  rental rate recommendation did not offer a unique, secret method for calculating
13  rates and was nothing more than a suggestion that The Home Depot increase its
14  hourly rate to reflect a larger percentage of its daily rate," and that (as plaintiff's own
15  expert conceded) "it is common knowledge that increasing a percentage results in
16  more money."  Pursuant to the "rule of mandate," the Ninth Circuit's remand order
17  defeats Rent IT's claim that Home Depot is somehow liable for implementing its
18  gratuitous rental rate advice.  See, e.g., U.S. v. Perez, 475 F.3d 1110, 1114 (9th Cir.
19  2007) (factual question settled on appeal cannot be reviewed, even for apparent
20  error); In re Fraschilla, 235 B.R. 449, 461-62 (B.A.P. 9th Cir. 1999) ("a lower court
21  may no more exceed the directions of a mandate by retrying the facts or altering its
22  findings than by disregarding the law as decided by the appellate court"); Herrington
23  v. County of Sonoma, 790 F. Supp. 909, 912 (N.D. Cal. 1991) ("a district court may
24  not exceed the directions of the mandate by retrying facts or altering findings").

25          11.     Having nonetheless considered the evidence that Rent IT
26  presented regarding rental rate, this Court concludes that Rent IT's advice regarding
27  rental rates was not "Confidential Information" under the NDA, and there were no
28  restrictions upon Home Depot's use of such advice.  Mr. Wynne did not indicate that

-13-

1  he was providing this advice under the NDA.  This advice was nothing more than

2  the common sense suggestion that Home Depot would make more money if it raised

3  its prices.  Moreover, for several years preceding this advice, Home Depot already

4  had charged some tools' extra-hour use at 25% or more of the four-hour rate, which

5  is the same advice regarding pricing that Mr. Wynne provided.

6  <u>Damages</u>

7       12.    The measure of damages if there had been any improper use or

8  disclosure by Home Depot would be the actual damages suffered by Rent IT,

9  measured by the use of that information to Rent IT's detriment.

10       13.    In contrast, the damages sought by Rent IT would not have been

11  recoverable even if there had been a breach of the NDA, and they are duplicative.

12  Rent IT seeks (a) its anticipated profits on a proposed tool rental software solution

13  the terms of which were never agreed to by Home Depot; plus (b) repayment of its

14  entire cost of running its business including the development expenses of an SAP-

15  based tool rental software; plus (c) disgorgement of Home Depot's alleged profits

16  from implementing a rental rate increase.

17       14.    <u>"Lost Profits."</u>  Rent IT's "lost profits" claim is deficient in that it

18  failed to demonstrate that the loss of the profits it expected to realize on a proposed

19  software development agreement "can be traced solely to" breach of the NDA "and

20  are the immediate fruit of the contract, independent of any collateral enterprise."

21  <u>Aon Risk Servs., Inc. of Georgia v. Comm. & Mil. Sys. Co.</u>, 607 S.E.2d 157, 162

22  (Ga. Ct. App. 2004) (citation omitted).

23       15.    Rent IT's claim for lost profits is also speculative.  As Georgia

24  law recognizes, "[i]n general, lost profits are not recoverable as contract damages

25  because of their speculative, remote, and uncertain nature."  <u>Market Place Shopping</u>

26  <u>Center, L.P. v. Basic Business Alternatives, Inc.</u>, 489 S.E.2d 162, 165 (Ga. Ct. App.

27  1997).  In this case, Rent IT seeks an amount of anticipated profits on anticipated

28  contracts that were indefinite as a matter of law.  <u>See O'Neal v. Home Town Bank</u>

-14-

of Villa Rica, 514 S.E.2d 669, 673 (Ga. Ct. App. 1999) ("Unless an agreement is reached as to all terms and conditions and nothing is left to future negotiations, a contract to enter into a contract in the future is of no effect.") (citation omitted).

16.   Moreover, lost profits may be recovered "only if the business has a proven 'track record' of profitability."  Witty v. McNeal Agency, Inc., 521 S.E.2d 619, 628 (Ga. Ct. App. 1999) (citation omitted).  As noted above, it is undisputed that Rent IT is a startup enterprise that has always operated at a loss.  The only revenue it ever generated was the $60,000 that Home Depot paid Rent IT in 2004 to help prepare "business requirements" and other software evaluation materials.  Thus, Rent IT failed to prove any lost profits "with reasonable certainty."  Aon Risk, 607 S.E.2d at 162.

17.   Restitution/"Out of Pocket" Expenses.  Rent IT already has been paid $60,000 in consideration for its efforts assisting with the preparation of the business requirements, use cases and process flows.  Rent IT submitted itemized invoices detailing it expenses in preparing those materials, which invoices Home Depot paid in full.

18.   Rent IT requests an award of its entire cost of running its business for an eighteen-month period, which it characterizes as its software development expenses, pursuant to GA. ANN. CODE § 13-6-9, which provides that "[a]ny necessary expense which one of two contracting parties incurs in complying with the contract may be recovered as damages."  However, Rent IT's software development expenses are irrelevant to "compliance costs" because it has not sued for breach of any software development contract.  Instead, it sued for breach of an NDA governing the use of confidential information.  Rent IT incurred these additional expenses hoping that it would eventually obtain contracts to develop and license software, not to "comply with" the NDA.

19.   Section 17 of the NDA, entitled "No Commitment," recites that, irrespective of any disclosure of "Confidential Information," Home Depot was not

-15-

1  "obligated to take, continue or forego any action with respect to the proposed

2  business arrangement."  In that Rent IT acknowledged in writing that Home Depot

3  had no obligation to proceed, the parties plainly intended that Rent IT would have

4  no right to recover its software development expenses absent execution of

5  additional, software development contracts.

6          20.     Rent IT failed to prove that the software development expenses

7  that it incurred were reasonably foreseeable and within the parties' contemplation as

8  the probable and natural result of any breach of the NDA.  Thus, the software

9  development expenses are irrelevant to the performance of the NDA and are not

10  recoverable.

11          21.     Rent IT relies on <u>Ajaxo Inc. v. E*Trade Group, Inc.</u>, 135 Cal.

12  App. 4th 21, 37 Cal. Rptr. 3d 221 (2005), for the proposition that a plaintiff may

13  recover as contract damages all of its costs incurred in developing proprietary

14  information protected by a nondisclosure agreement.  Setting aside that <u>Ajaxo</u> was

15  decided under California law, not Georgia law, Rent IT has failed to identify the

16  expenses it incurred to develop the particular items or categories of its claimed

17  confidential information that it asserts Home Depot used.  Cf. <u>Camp Creek</u>

18  <u>Hospitality Inns, Inc. v. Sheraton Franchise Corp.</u>, 139 F.3d 1396, 1412 (11th Cir.

19  1998) ("Camp Creek's generalized evidence on damages does not isolate losses

20  directly attributable to any particular misuse of confidential information").  Rather,

21  Rent IT seeks the entire cost of running its business, as opposed to the cost of

22  developing the specific "Confidential Information" it claims that Home Depot used.

23  As it relates to the cost of developing the specific "Confidential Information" it

24  claims that Home Depot used, namely the business requirements, Rent IT has

25  admitted that it incurred little to no expense in developing those.

26          22.     Given that Rent IT never incurred as a cost the "value" of its

27  principals' time spent trying to develop SAP-based tool rental software or preparing

28

-16-

1   Rent IT's claimed "Confidential" information, it cannot obtain an award of such

2   amounts in this suit.

3           23.    Disgorgement.  Rent IT cannot obtain a disgorgement remedy on

4   a breach of contract claim.  Even if it had proved liability, Rent IT would be entitled

5   only "to be placed in the position [it] would have been in had the contract been

6   performed."  Broadcast Concepts, Inc. v. Optimus Fin. Servs., LLC, 618 S.E.2d 612,

7   615 (Ga. Ct. App. 2005) (citation omitted); see also Junker v. Eddings, 396 F.3d

8   1359, 1368 (Fed. Cir. 2005) (holding that the plaintiff could not obtain an award of

9   the defendant's profits on a claim for breach of a nondisclosure agreement);

10  Marzullo v. Jim Ellis Motors, Inc., 560 S.E.2d 309, 311 (Ga. Ct. App. 2002) ("The

11  measure of damages in the case of a breach of contract is the amount which will

12  compensate the injured person for the loss which a fulfillment of the contract would

13  have prevented or the breach of it entailed."); Webb v. Hancock Plumbing &

14  Heating Co., 391 S.E.2d 697, 716 (Ga. Ct. App. 1990) ("An injured party cannot be

15  placed in a better position than he would have been in if the contract had not been

16  breached.").

17          24.    Rent IT's argument that Section 11 of the NDA authorized an

18  award of Home Depot's profits is without merit.  The NDA did not provide for

19  disgorgement as a remedy for breach, and the reference at Section 11 to equitable

20  relief merely preserved the parties' right to seek equitable relief -- i.e., an injunction

21  against further disclosure of confidential information -- regardless of whether that

22  party could also state a damages claim.

23          25.    Attorneys' Fees.  Rent IT also demands the attorneys' fees it has

24  incurred to prosecute this action pursuant to GA. ANN. CODE § 13-6-11, which

25  provides that:  "The expenses of litigation generally shall not be allowed as a part of

26  the damages; but where the plaintiff has specially pleaded and has made prayer

27  therefor and where the defendant has acted in bad faith, has been stubbornly

28  litigious, or has caused the plaintiff unnecessary trouble and expense, the jury may

allow them."  Even if Rent IT had prevailed on its remaining claim for relief, by its own terms, Section 13-6-11 required Rent IT to specifically demand such an award in its Complaint.  See also Dept. of Transp. v. Georgia Tel. Co., 536 S.E.2d 773, 776 (Ga. Ct. App. 2000) ("A general request for attorney fees, without reference to OCGA § 13-6-11 or the criteria set forth therein, is not the specific pleading contemplated by the statute.  The statute requires that the party specifically plead and pray for fees thereunder."); Williams v. Binion, 490 S.E.2d 217, 219 (Ga. Ct. App. 1997) ("[a]wards under this Code section must be prayed for in the complaint").  Rent IT failed to do so.  Moreover, as noted above, Home Depot did not act in bad faith, and Rent IT has failed to demonstrate that Home Depot was "stubbornly litigious" or caused it "unnecessary trouble and expense."

      26.    For the foregoing reasons, judgment shall be entered in favor of Home Depot and against Rent IT on the claim for breach of the NDA.

    The Court has reviewed these findings and conclusions and adopts them as supported by the evidence and the law.

Oct. 17, 2008

DATED: _____      _____

                         HON. MANUEL L. REAL

1
2    Respectfully submitted:

3    QUINN EMANUEL URQUHART
     OLIVER & HEDGES, LLP
4
5    BAKER MARQUART CRONE &
     HAWXHURST LLP
6
7    By _____
           David W. Quinto
8          Diane M. Doolittle
9          Daryl M. Crone
           Attorneys for Defendant
10         Home Depot U.S.A., Inc.
11
     Dated:  October 8, 2008
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

-19-